461 So.2d 88 (1984)
STATE of Florida, Petitioner,
v.
Cleo D. LeCROY and Jon M. LeCroy, Respondents.
No. 64744.
Supreme Court of Florida.
December 13, 1984.
Rehearing Denied January 24, 1985.
*89 Jim Smith, Atty. Gen., and Joy B. Shearer, Asst. Atty. Gen., West Palm Beach, for petitioner.
James L. Eisenberg of Green, Eisenberg & Cohen, West Palm Beach, and Michael Dubiner of Dubiner & Blumberg, West Palm Beach, for respondents.
SHAW, Justice.
This cause is before us on a certified question of great public importance. State v. LeCroy, 435 So.2d 354, on rehearing, 441 So.2d 1182 (Fla. 4th DCA 1983). We have jurisdiction. Art. V, § 3(b)(4), Fla. Const.
The certified question reads in full:
Where statements made by appellants when measured by traditional factual tests are found to have been given voluntarily and without coercion or inducement, they may nonetheless be rendered legally involuntary and therefore subject to being suppressed under Miranda v. Arizona, 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694] (1966) where, immediately following the reading of the Miranda warnings, the following statement is also read:
This statement is taken primarily in order to refresh your memory at the time you may be called to testify, if and when this matter goes to court.
LeCroy, 441 So.2d at 1183. We answer the question with a qualified no. The additional advice (hereinafter "refresher" advice) did not under the circumstances here render the obtained statement legally involuntary and suppressible under Miranda v. Arizona, 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
Respondents Cleo and Jon LeCroy, suspects in a double murder, voluntarily accompanied police to a station house in Belle Glade, Palm Beach County. Cleo gave one unrecorded and one recorded statement to a police officer which implicated him in the double murder. Miranda warnings were given prior to these statements and the police did not give the "refresher" advice in their prefatory comments. These statements were not suppressed and are not at issue. Soon after giving these statements, Cleo asked a second police officer to receive a clarifying statement. Cleo's Miranda *90 rights were given and acknowledged again. Thereafter, the interrogating officer prefaced his questioning with the following comments which identified and explained the interrogation:
"Detective Browning: All right. For the record, if you understand these rights, how about signing the card for me, indicating that you understand. For the record, Mr. LeCroy is now signing the rights card.
Okay, continuing. Mr. LeCroy, the Palm Beach County Sheriff's Department is presently investigating the circumstances surrounding a double shooting which allegedly occurred on Sunday, January 4th, 1981 in the Brown's Farm Hunting Area. I have reason to believe that you have knowledge pertaining to this incident. I would like for you to tell me, in your own words, in the order in which they occurred, the circumstances through which you were involved in the incident, either prior to, during or immediately after the incident. Although I would like this statement to be in your own words, I may interrupt your chain of thought in order to ask you specific questions about certain circumstances as they develop in the statement. This statement is taken primarily in order to refresh your memory at the time you may be called upon to testify, if and when this matter goes to court.

If you would, at this time, I would like for you to tell me what happened... . (Emphasis supplied.)
Before beginning our analysis of the legal issues, we feel constrained to comment that the "refresher" advice was inappropriate when questioning a suspect. More seriously, it was mischievous, as evidenced by the subsequent appeal and review, in that it forces the courts to perform a case-by-case inquiry into the voluntariness of statements, thus obviating one of the prime virtues of the Miranda rule. California v. Prysock, 453 U.S. 355, 359, 101 S.Ct. 2806, 2809, 69 L.Ed.2d 696 (1981). We roundly condemn its use. Nevertheless, as the Prysock court recognized, the Miranda warning is not a talismanic incantation. It is the totality of circumstances which determine whether a statement was voluntarily given. Id. Both the trial court and the district court of appeal recognized that if the "refresher" advice had not been given the statement would have been admissible. We agree but go further. When the totality of circumstances is expanded to include the "refresher" advice, it is still clear that the statement was voluntarily given and should have been admitted. Cleo received and acknowledged numerous Miranda warnings and there is nothing in the record to suggest that he did not understand his rights or that he was coerced or deceived into making the statement. We quash the portion of the district court decision affirming the suppression of the statement.
Following the second recorded statement, Cleo accompanied two police officers to Miami in order to retrieve a shotgun and pistol at his Miami home and a rifle at the home of a friend, Elliot. The trial court suppressed these weapons and any statements given by Cleo during the journey based on the theory that they were tainted by the illegally obtained statement addressed above. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Our holding that the statement should not have been suppressed disposes of this issue. We add, however, that the record indicates that the officers knew of the weapons and their locations as a result of Cleo's earlier statements and the weapons appear to be admissible under the independent source doctrine. Nix v. Williams, ___ U.S. ___, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920).
The issues surrounding Jon LeCroy's suppressed statements are more complex and require a remand in part for a further hearing. Jon gave an unrecorded statement to Officer Copeland. In denying a motion to suppress this statement, the trial court found as follows:

*91 That this defendant's initial oral, unrecorded statement given to Officer Copeland at about 3:30 p.m., January 11, 1981, was freely and voluntarily made with an intelligent understanding of his rights under Miranda v. Arizona, supra. No threats, promises or improper inducements were made or offered to the defendant in exchange for that statement. See pages 389-394 of the July 8, 1981 transcript. This defendant was not informed of the above quoted admonition that the primary purpose of the statement was to refresh his memory if called to testify at trial. See page 419 of the transcript. The motion is therefore denied as to that oral statement to Officer Copeland.
In his testimony on the contents of this statement, Copeland testified that Jon admitted having viewed both bodies soon after the murders but denied participating with his brother, Cleo, in the murders. Copeland further testified that Jon admitted having received a .38 caliber revolver from Cleo on the day following the murders which Cleo had taken from the victims. Jon said he received the revolver at a friend's home and had left it there. According to Copeland, Jon told him the name of the friend and agreed to accompany him and furnish directions to her Miami home in order to retrieve the revolver. Copeland further testified that Jon requested a polygraph test to verify the truth of his statement. According to Copeland, the police were anxious to retrieve the weapons and consequently delayed the taking of the polygraph test.
Following the above statement which occurred contemporaneously with Cleo's statements regarding the location of various weapons, the police undertook to retrieve the weapons. Officers Copeland and Driggers and Jon left for Miami, approximately ninety miles away, to retrieve the .38 revolver. Officers Browning and Welty and Cleo left for Miami in a second car in order to retrieve the rifle from the home of Cleo's friend, Elliot. After independently retrieving the revolver and rifle, the two parties were to rendezvous with the other party of officers at the LeCroy home to retrieve the shotgun and pistol.
Enroute to Miami, Jon stated that he wanted an attorney. The senior officer told the other officer and Jon that all questioning would cease until Jon obtained an attorney, but the officers continued to Miami. It is controverted as to whether the officer asked for directions to the friend's home; it is uncontroverted that Jon provided such directions and that these directions facilitated the seizure of the .38 revolver. Based on these events, the trial court suppressed the .38 revolver as to Jon only, reasoning that the officers would not have been able to seize the weapon except for the directions Jon gave to the friend's home after having asked for an attorney. It does not seem nearly that clear to us. First, when Jon requested an attorney enroute to Miami, the officers were not obligated to immediately produce an attorney nor were they obligated to terminate their investigative trip. Second, according to Officer Copeland's testimony, on which the trial court relied, the police knew the name of the friend and it appears probable that the police would have located the home using routine investigative techniques with or without Jon's directions. Based on the record before us, we are not prepared to say to a certainty that this is so. Nevertheless, we are not prepared to put the police in a worse position than they would have been in absent the directions given by Jon by taking the drastic and socially costly course of holding that this evidence is forever barred from use. We recognize that neither the trial court nor the district court had the benefit of Nix v. Williams. Accordingly, we remand with directions that a hearing be conducted on whether the .38 revolver would have been discovered under either the independent source or inevitable discovery doctrines. Nix v. Williams; Silverthorne.
After obtaining the four weapons in Miami, the police returned Jon and Cleo to Belle Glade that same evening. The record indicates that Jon still desired a polygraph *92 test and that at approximately 12:45 a.m., 12 January 1981, the police obtained a statement from Jon. No Miranda warnings were given, only the "refresher" advice. In view of Jon's earlier request for an attorney, and the failure of the police to provide an attorney or to give a Miranda warning, we agree with the trial court that this statement should be suppressed.
The following afternoon Jon made his first appearance where he was represented by a court-appointed attorney. The attorney moved for a gag order restraining the police from further interrogation of Jon. This motion was denied on the rationale that while Jon did not have to talk to the police, the court could not order him not to do so if he so desired. After the first appearance, Officers Browning and Welty approached Jon, advised him he had an attorney who did not wish him to talk to them but asked if he still desired a polygraph test. Jon replied that he did, received and acknowledged his Miranda rights without receiving the "refresher" advice, and waived his right to have counsel present. The trial court suppressed this statement, taken at approximately 8:43 p.m., 12 January 1981, reasoning that Jon had earlier requested an attorney and that the police had initiated the contact in violation of Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). We disagree. First, neither the trial court nor the district court had the benefit of Solem v. Stumes, ___ U.S. ___, 104 S.Ct. 1338, 79 L.Ed.2d 579 (1984). Therein, the Court reasoned that retroactive application of the Edwards per se rule to collateral relief proceedings would not serve the purpose of deterring police misconduct as contemplated by the exclusionary rule. Accordingly, the Court declined to hold that Edwards was retroactive. The Court was careful to say that it was not addressing the issue of retroactive application of Edwards to cases on direct appeal, such as we have here. Nevertheless, applying the rationale of Solem, we do not see how the purpose of the exclusionary rule, deterring police misconduct, will be served by retroactively applying Edwards to police conduct which occurred prior to its issuance. The Solem court expressly acknowledged that Edwards established a new rule, that the police could not be faulted for failing to anticipate its per se approach, that a waiver of the right to counsel could be voluntary even if the police initiated contact after counsel was requested, that Edwards has little to do with the truth-finding function, that it would be unreasonable to expect the police to have followed the bright line of Edwards prior to its announcement, and that retroactive application would have a disruptive effect on the administration of justice. We agree in all respects and hold that Edwards is not retroactively applicable to cases on direct appeal. Second, even if Edwards were applicable, the trial court overlooked the fact that an attorney had been appointed as requested, that this attorney had argued in open court in Jon's presence that Jon should not be interrogated, and that Jon had been advised by the presiding judge that he did not have to talk to the police. Further, prior to interrogating Jon, the police advised him that his attorney did not want him to talk to the police and gave a Miranda warning which Jon acknowledged. We have no doubt on this record that Jon understood his right either to remain silent or to have his attorney present and that Jon actively desired to talk to the police and to take a polygraph test. It is the second Edwards holding, not the first, which is applicable to these facts:
We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police. (Emphasis supplied.)
Edwards, 451 U.S. at 485, 101 S.Ct. at 1885.
The trial court also reasoned that the 8:43 p.m. statement was the fruit of the poisoned 12:45 a.m. statement. Although we agree that the 12:45 a.m. statement *93 should be suppressed, we do not agree that it tainted the later statements. Prior to and following the 12:45 a.m. statement, Jon had consistently requested, even demanded, a polygraph test which he maintained would support his innocence of the murders. It is clear that the 8:43 p.m. interrogation would have occurred had the earlier statement not been given. Further, following the 12:45 a.m. statement, an attorney was appointed and Jon was advised by the attorney, the court, and the police that he had the right not to talk to the police. We hold that the 8:43 p.m. statement did not result from an exploitation of the 12:45 a.m. statement and that the events occurring between the two statements attenuated any causal connection between the statements. Wong Sun.
Jon's third (and last) recorded statement was given at 6:54 p.m. on 13 January 1981. Jon received and acknowledged his Miranda rights but was also advised that the primary purpose of the statement was to refresh his memory should he testify at trial. The trial court suppressed the statement on the grounds it was taken in violation of Edwards and Wong Sun and was obtained by deception. We disagree for the reasons previously enunciated.
Petitioner also appeals the dismissal of Count V which charged respondents with concealing evidence. The district court affirmed the dismissal without further comment. We approve.
We summarize our opinion as follows:
(1) The answer to the certified question is a qualified no. The "refresher" advice does not so dilute the Miranda warning as to render a resulting statement per se legally involuntary.
(2) We quash the portion of the district court decision affirming the suppression of Cleo LeCroy's second recorded statement of 11 January 1981, and of the shotgun, rifle and pistol which were seized at the LeCroy and Elliot homes.
(3) We approve the suppression of Jon LeCroy's statement given at approximately 12:45 a.m., 12 January 1981.
(4) We disapprove the suppression of Jon LeCroy's statements given at approximately 8:43 p.m., 12 January 1981, and 6:54 p.m., 13 January 1981.
(5) On the question of suppressing the .38 caliber revolver as to Jon, we remand to the district court with directions that it remand to the trial court for a hearing to determine if the police would have discovered the revolver under either the independent source or inevitable discovery rules absent the directions given by Jon which enabled the police to proceed directly to the home where the revolver was seized. Nix v. Williams, Silverthorne.
(6) We approve the dismissal of Count V.
We approve in part and quash in part the decision of the district court and remand for further proceedings consistent with this opinion.
It is so ordered.
BOYD, C.J., and ADKINS, OVERTON, ALDERMAN, McDONALD and EHRLICH, JJ., concur.