500 So.2d 240 (1986)
The STATE of Florida, Appellant,
v.
Robert Milton GRIFFITH, Appellee.
No. 86-994.
District Court of Appeal of Florida, Third District.
December 9, 1986.
Rehearing Denied January 29, 1987.
*241 Jim Smith, Atty. Gen., and Richard L. Polin, Asst. Atty. Gen., for appellant.
Weiner, Robbins, Tunkey & Ross and Peter Raben, Miami, for appellee.
Before BARKDULL, HENDRY and JORGENSON, JJ.
JORGENSON, Judge.
This is an appeal by the state from the trial court's order granting in part the motion of defendant Robert Milton Griffith to suppress evidence, statements, and witness testimony. For the reasons which follow, we reverse that portion of the trial court's order suppressing the testimony of Y.B., the juvenile victim/prosecutrix.[1]
A full description of the facts leading to this prosecution is essential to an understanding of the legal issue presented by this appeal. The events prompting Griffith's arrest were set into motion by a former employee of Griffith who advised the Miami Police that Griffith was actively involved in photographing young girls in the nude. According to his ex-employee, Griffith secreted a collection of lewd photographs of young girls in a file cabinet in his office. This tipster further revealed that Griffith would pay young girls to pose for sexually explicit pictures at his office and that he had personally observed at least three such girls arrive at the office at closing time. The employee referred police to a coworker for additional details.
The police initiated an investigation of Griffith which culminated in the procurement of a search warrant for Griffith's office. A search was conducted of Griffith's office, and numerous photographs of nude young girls were seized from a file cabinet. Y.B. was featured in some of these photographs. Also seized from Griffith's office was an address book which contained a listing for Y.B.'s mother [Mrs. B.]. Immediately following the office search, Griffith was arrested and advised of his constitutional rights pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
When the police requested his consent to a search of his home, Griffith expressed reluctance. The police responded by threatening to get a search warrant for the home and by suggesting that Griffith's dog would have to be destroyed if it interfered with their entry and search. Under these circumstances, Griffith signed a consent-to-search form. The ensuing search of Griffith's home yielded three photographs: two were of Y.B. and one was of an adult female. At the time the photographs were seized, the police were not aware of the identities of the subjects in the photographs.
Griffith was subsequently transported to the police station where he was again apprised of his Miranda rights. Griffith was then presented with a waiver-of-rights form for his consideration and approval. Griffith signed his initials by each paragraph on the form except the paragraph stating, "I am willing to answer questions asked of me." Despite Griffith's failure to approve the paragraph regarding questioning, police officers sought to interrogate him. Detectives Judith Turner and Oscar Callejas confronted Griffith with the photograph of the adult female seized from his home. Griffith identified the woman as his ex-wife, Terry Macannon. Next Griffith was shown one of the nude photographs of Y.B. taken from his office. He denied knowing the girl's identity. Finally, a photograph from Griffith's home was displayed. This picture represented a clothed Y.B. sitting on Griffith's lap in Griffith's home. Faced with the evidence contradicting *242 his denial of knowing the girl, Griffith disclosed that he knew the girl's mother. At this juncture, Griffith refused to answer further questions.
Detective Callejas began an investigation to ascertain the identity of the young girl portrayed in the photographs. He first questioned Griffith's secretary, Iris Rodriguez, who gave him the name and occupation of Griffith's ex-wife, Terry Macannon. Ms. Rodriguez could not identify Y.B.; however, she did confirm that Griffith had a collection of pornographic photographs and a penchant for sexual activities with young girls. As the next step in his investigation, Callejas interviewed Terry Macannon. Like Iris Rodriguez, Terry Macannon was unable to identify the juvenile girl depicted in the photographs. She referred Callejas to Mrs. B. as an individual who might be able to place the girl. Callejas checked the listing for Mrs. B. in the address book secured from Griffith's office and contacted her. Mrs. B. identified the girl as her daughter, Y.B.
The police at this time interviewed Y.B., a fifteen-year-old girl who revealed that she had been the victim of sexual battery and abuse by Griffith between 1975 and 1982 when she was five-to-twelve years old. The state obtained an affidavit from Y.B. detailing the acts committed by Griffith. Griffith was then charged with eight counts of sexual battery and nine counts of lewd assaults or acts on a minor.
In his motion to suppress evidence, statements, and witness testimony, Griffith sought suppression of (1) items seized from his office; (2) items seized from his home; (3) statements made by Griffith at the police station; and (4) the testimony of Y.B. Following an evidentiary hearing, the trial court issued a written order with detailed findings as to each of the four points asserted. The court ruled that the search of Griffith's office pursuant to the search warrant was valid, that the search of the house was unlawful, that Griffith's statements were elicited in violation of his Miranda right to silence, and that the testimony of Y.B. was "a derivative product of police illegalities." The trial court granted Griffith's suppression motion as to the evidence seized from his home, the statements made at the police station, and the testimony of Y.B. The court denied suppression of the materials taken from Griffith's office. The state appeals only the suppression order regarding the testimony of Y.B.
The narrow issue before this court is whether the trial court properly deemed the testimony of Y.B. a derivative fruit of police misconduct.[2] The trial court erred in its determination that the discovery of Y.B. was inextricably tied to the police illegalities. We, therefore, reverse that portion of the trial court's order suppressing the testimony of Y.B.
In its order the trial court set forth its analysis of the relationship between the discovery of Y.B. and the police misconduct as follows:
Pictures found during the illegal search of Mr. Griffith's home were utilized to question Mr. Griffith. During that illegal questioning, Mr. Griffith made incriminating remarks concerning the identity of a person in a photo. The seizure of the photos from the home and the questioning of Mr. Griffith led the police to the discovery of [Y.B.] as a witness for the State. [Y.B.'s] existence and identity were undoubtedly direct products of the two illegalities. (Citations omitted.)
The trial court further found that the state did not meet its burden of showing either that Y.B. would have come forward to testify of her own volition in accordance with the standard of United States v. Ceccolini, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 *243 (1978),[3] or that the identity of Y.B. would have been inevitably discovered by the police within the parameters of Nix v. Williams, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).[4] A study of the exclusionary rule and its interrelated exceptions compels the conclusion that the testimony of Y.B. is admissible evidence against Griffith under the "independent source" doctrine.
The exclusionary rule provides that evidence obtained directly or indirectly from a violation of the fourth amendment is not admissible against an accused at trial. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The harsh consequences of the "fruit of the poisonous tree" doctrine are ameliorated by three crucial exceptions. A court may admit such evidence if the state can show that (1) an independent source existed for the discovery of the evidence, Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920); (2) the evidence would have inevitably been discovered in the course of a legitimate investigation, Nix v. Williams, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 77 (1984); or (3) sufficient attenuation existed between the challenged evidence and the illegal conduct, Wong Sun. A careful review of the record before us points to the applicability of the independent source exception to the facts of this case.
The independent source doctrine was first espoused by the Supreme Court in Silverthorne when the Court endorsed the exclusion of derivative evidence. The Court mandated suppression of evidence seized pursuant to a subpoena because the subpoena was premised on information obtained from an illegal search and seizure. The government had previously searched a corporation's office without a warrant and seized its documents. These papers were copied and the originals returned to their rightful owner. The defendant was then indicted based upon the knowledge the state acquired from these papers. The Court disapproved such a practice as violative of the fourth amendment. Accordingly, it held that the essence of the exclusionary rule was to bar the government from using evidence obtained in an unconstitutional manner. The Court tempered the penalty of this prohibition by recognizing that, if the government could have obtained the same knowledge through a source independent of the illegal action, the government could use such evidence. The Court summarized this concept:
The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the court, but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others... .
Silverthorne, 251 U.S. at 392, 40 S.Ct. at 183, 64 L.Ed. at 321 (emphasis added).
The Court reaffirmed the vitality of the independent source doctrine in Segura v. United States, 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984). The issue before *244 the Segura Court was whether evidence discovered during a valid search of an apartment was to be considered a fruit of the initially illegal entry and occupation of the apartment. The Court answered the question in the negative. Although DEA agents had improperly entered the apartment and remained there for approximately nineteen hours awaiting the issuance of a search warrant, the Court refused to suppress the evidence seized pursuant to the warrant where the information upon which the warrant was issued was not derived from any information gained by the agents during their protracted occupation of the apartment. The Court found "beyond dispute that the information possessed by the agents before they entered the apartment constituted an independent source for the discovery and seizure of the evidence now challenged." 468 U.S. at 814, 104 S.Ct. at 3391, 82 L.Ed.2d at 614-15. Significantly, the Segura Court did not require that the government prove it could have successfully obtained the evidence, but simply that it prove it would have discovered it through independent means.
A survey of cases which have determined when the independent source exception obtains reinforces our conclusion that the testimony of the witness in this case, Y.B., is clearly admissible on this ground. In United States v. Houltin, 566 F.2d 1027 (5th Cir.), cert. denied, 439 U.S. 826, 99 S.Ct. 97, 58 L.Ed.2d 118 (1978), the defendants challenged the government's use of the testimony of their codefendants as derived from illegal wiretaps. The defendants pointed out that the government first learned the substance of their codefendants' testimony regarding the marijuana smuggling operation through the illegal wiretaps. The court found this factor of little import and rejected the defendants' argument. Instead the court found that the testimony of the codefendants was conveyed to the government by the codefendants themselves who voluntarily elected to cooperate with the government. Since the testimony came from the codefendants' own intimate knowledge of the drug smuggling operation rather than from the wiretaps, the court concluded that the testimony constituted an "independent source." Id. at 1031.
The independent source rule was applied with similar results in United States v. Bienvenue, 632 F.2d 910 (1st Cir.1980). The defendant alleged that evidence of his two previous trips to Colombia was illegally seized from his home and used to discover the records of various travel agents. These records were admitted as evidence against the defendant at trial. The government conceded that the search of the home had been unlawful but contended that the records of the travel agencies were properly admitted under both the independent source and inevitable discovery doctrines. The reviewing court agreed with the government's position on the basis of the other evidence available to the government prior to the execution of the unlawful search warrant. The government already knew that the defendant had travelled with tickets issued by a Manchester travel agency; thus, the records of the specific Manchester travel agency would have been inevitably discovered through interviewing all Manchester travel agencies in a routine investigation. Moreover, the court reasoned that police inspection of customs records would have revealed the defendant's travels and, thus, comprised an additional independent source of the information challenged by the defendant.
In State v. Le Croy, 461 So.2d 88 (Fla. 1984), cert. denied, ___ U.S. ___, 105 S.Ct. 3532, 87 L.Ed.2d 656 (1985), the Supreme Court of Florida reviewed the correctness of suppressing statements and physical evidence as tainted by police misconduct. The defendants in Le Croy were brothers who were suspected of two murders. The brothers, Cleo and Jon, had voluntarily gone to the police station for questioning. Various events transpired which raised fourth amendment issues regarding both defendants.
Cleo Le Croy was given his Miranda rights and proceeded to ostensibly waive these rights by making inculpatory statements. Following a break in the questioning, *245 the interrogating officer reminded Cleo of his Miranda rights but erroneously added the misinformation that the statements were being taken "primarily in order to refresh your memory at the time you may be called upon to testify, if and when this matter goes to court." Id. at 90. Cleo thereupon made additional incriminating statements. Subsequent to the "refresher" advice, Cleo also accompanied police officers to two locations to retrieve Cleo's firearms. The lower courts found that suppression of both the statements and the weapons was warranted since they were tainted by the improper caveat to Cleo's Miranda warning. The supreme court disagreed and concluded that Cleo's statements were all voluntary, despite the "refresher." Since the statements were voluntary, the weapons seized were not tainted by the "refresher." Although the court based its decision on the voluntary nature of the statements, it perceptively noted that the weapons would be equally admissible under the independent source doctrine. Id.
The court then examined the question of whether Jon Le Croy was entitled to the suppression of a weapon. Jon accompanied the police on an investigative trip to search for the murder weapon. During the trip, Jon announced his desire for counsel. The police thereafter asked him for directions to the friend's home where the weapon was located; Jon imparted this information. The home was located, and the weapon seized. The court decided that a remand of the case to the trial court was necessary in order to determine whether the weapon would have been located under either the independent source or inevitable discovery exceptions. The court noted the significance of the facts that the defendant only expressed his desire for counsel when the party was travelling to their destination and that the police already knew the name of the friend in whose home the weapon was located. Without a more detailed record before it, the court was "not prepared to put the police in a worse position than they would have been in absent the directions given by Jon by taking the drastic and socially costly course of holding that this evidence is forever barred from use." Id. at 91.
Other courts have employed the same analysis in deciding whether a sufficiently independent lead would have revealed the evidence. See United States v. Leonardi, 623 F.2d 746 (2d Cir.) (where existence, identity, and potential value of witness were known to police prior to illegal seizure of witness's driver's license, witness could not be considered "found" as a consequence of the illegal search), cert. denied, 447 U.S. 928, 100 S.Ct. 3027, 65 L.Ed.2d 1123 (1980); United States v. Fredericks, 586 F.2d 470 (5th Cir.1978) (suppression of evidence not required despite illegal search where government agents had ascertained witness's identity, her relationship with one defendant, and critical portion of her testimony prior to search), cert. denied, 440 U.S. 962, 99 S.Ct. 1507, 59 L.Ed.2d 776 (1979).
In the instant case the police had at least three alternative methods which would have led to the identity of Y.B. apart from the illegal search of Griffith's home and his improper interrogation. As the state correctly posits, it could have learned Y.B.'s identity in the following ways. First, by questioning Iris Rodriguez, the police learned the name and occupation of Griffith's ex-wife, Terry Macannon, thereby rendering Griffith's revelation of his ex-wife's identity through the photograph seized from his home merely gratuitous. Since Terry Macannon provided the link to Mrs. B. and hence to Y.B., the police already had a legitimate method of reaching Terry Macannon. Next, the state points out that, in the course of a regular police investigation of Griffith, the existence of Griffith's ex-wife would have come to light and the trail to Y.B. would have been uncovered. The last alternative by which the police could have found Y.B. concerns the address book and photograph of Y.B. taken from Griffith's office under a valid search warrant. By showing the photograph to each person listed in the address book, the police would have ultimately approached *246 Mrs. B. as one of the entries in the book. Mrs. B. would have identified her daughter's photo and afforded the police access to Y.B.
The trial court specifically noted that the state did not successfully prove an attenuation between the witness, Y.B., and the illegal police conduct under the strictures of Ceccolini wherein the Supreme Court held that the attenuated connection between an illegal search and live witness testimony dissipated the taint of the search and rendered the testimony admissible. The police officer in Ceccolini had illegally searched an envelope in a flower shop and discovered gambling slips. The officer learned from an employee, Hennessey, that the envelope belonged to the shop's owner, Ceccolini. The officer conveyed this information to the FBI. Months later the FBI interviewed Hennessey. She subsequently testified against Ceccolini before the grand jury. At his trial Ceccolini succeeded in having Hennessey's testimony suppressed as a fruit of the unlawful search of the envelope. The Supreme Court reversed the exclusion on the grounds that her testimony was effectively purged of the taint of the illegal search. The court pointed out the higher cost of disallowing live witness testimony and quoted with approval Smith v. United States, 324 F.2d 879, 881-82 (D.C. Cir.1963), cert. denied, 377 U.S. 954, 84 S.Ct. 1632, 12 L.Ed.2d 498 (1964):
The proffer of a living witness is not to be mechanically equated with the proffer of inanimate evidentiary objects illegally seized. The fact that the name of a potential witness is disclosed to police is of no evidentiary significance, per se, since the living witness is an individual human personality whose attributes of will, perception, memory and volition interact to determine what testimony he will give. The uniqueness of this human process distinguishes the evidentiary character of a witness from the relative immutability of inanimate evidence.
Ceccolini, 435 U.S. at 277, 98 S.Ct. at 1060-61, 55 L.Ed.2d at 282. The court proceeded to formulate a test for admissibility that included (1) the willingness of the witness to testify; (2) the period of time between the illegality and the discovery of the witness; and (3) the nature and flagrancy of the constitutional violation. Id. at 276-78, 98 S.Ct. at 1060-61, 55 L.Ed.2d at 277-78. Finally, the court reasoned that because the cost to society of excluding live witness testimony would often be greater than the deterrent effect such exclusion would have on police misconduct, "a closer, more direct link" between the illegality and live-witness testimony is required before a court must exclude such evidence. Id. at 278, 98 S.Ct. at 1061, 55 L.Ed.2d at 278.
Although this case turns on the independent source exception and not the attenuation doctrine, the Ceccolini attenuation factors are instructive. Considering first the effect of the illegal conduct on the exercise of the witness's free will, we find that the police misconduct played no role in gaining Y.B.'s willing cooperation. Griffith argues that, because Y.B. never came forward since 1975 when she was first sexually abused, we are bound to conclude that she was not a voluntary witness against Griffith. Griffith also criticizes Y.B.'s physical absence from the suppression hearing as probative of her involuntary status. We are unpersuaded by Griffith's reasoning. Griffith has not demonstrated that Y.B.'s cooperation was induced by government coercion or judicial process. Cf. United States v. Scios, 590 F.2d 956 (D.C. Cir.1978) (insufficient attenuation where illegal search led to discovery of witness who refused to testify until subpoenaed and threatened with contempt). It would be eminently unreasonable to expect a child victim to locate the proper authorities in order to confide the degradations she suffered. Nor would any purpose have been served by compelling Y.B.'s presence at the suppression hearing where her affidavit fully detailed the substance of her testimony and Y.B. now resides in another state. Moreover, the fact that a witness is not anxious to testify does not render testimony involuntary. United States v. Parker, 722 F.2d 179, 185 (5th Cir.1983); Houltin, *247 566 F.2d at 1032. From this record the presumption remains that Y.B. is a voluntary witness.
Next, we examine the temporal proximity between the illegalities and the discovery of Y.B. Griffith emphasizes that only a few weeks elapsed between the illegalities and the location of Y.B. In support of his argument that such a brief time span cannot dispel the stigma of police misconduct, Griffith cites United States v. Mergist, 738 F.2d 645 (5th Cir.1984), wherein a two-year lapse between the improper interrogation of a witness and the witness's testimony at the defendant's trial was deemed adequate to neutralize the testimony of any corrupting influence from the interrogation. While Griffith correctly postulates that the length of the "road" between unlawful police action and the discovery of a witness is one factor to weigh in determining whether suppression is warranted, it is not the sole factor. See United States v. Hooton, 662 F.2d 628 (9th Cir.1981) (where police misconduct did not directly secure witnesses' testimony, suppression not called for despite fact that the misconduct was one event in uninterrupted series that led to the witnesses' testifying), cert. denied, 455 U.S. 1004, 102 S.Ct. 1640, 71 L.Ed.2d 873 (1982). The hiatus of several weeks separating the events in the instant case supports our conclusion that the unlawful police activity in searching Griffith's home and questioning him at the police station was only one part of the entire scenario that led to the identification of Y.B. The time factor is also of less significance here because Y.B. was not involved in any of the prior unlawful police activity. See United States v. Brookins, 614 F.2d 1037 (5th Cir.1980) (short time span between illegal interrogation of defendant and location of witness not of paramount importance where witness not part of interrogation and not coerced or influenced by police misconduct regarding defendant).
Finally, we apply the prong of the Ceccolini test for admissibility that requires balancing the social cost of "exclusion [that] would perpetually disable a witness from testifying about relevant and material facts" against the deterrent purpose of the exclusionary rule. Ceccolini, 435 U.S. at 277, 98 S.Ct. at 1061, 55 L.Ed.2d at 278. We first consider the police motivation in searching Griffith's home and in interrogating him. Griffith contends that the police did not intend to learn as much as possible about Griffith's alleged involvement in the sexual abuse of young girls, but rather that they searched his home to garner information with which to locate witnesses. We disagree. The location of witnesses to testify against Griffith was but one of the purposes behind the search. Furthermore, the police did not search or interrogate solely to obtain evidence regarding Y.B. Suppression of Y.B.'s testimony on the ground that her identity was among the various aspects of police investigation of Griffith would have only limited deterrent value. While the information about Y.B. gained from the search of Griffith's house and in his unlawful interrogation was undoubtedly part of the chain of causation that led to Y.B., her identity and testimony could easily and lawfully have been traced through Griffith's seized address book, the seized photograph, or lawful access to Terry Macannon. In Ceccolini, witness Hennessey's testimony derived solely from the information obtained in the police officer's unlawful search and was nonetheless deemed sufficiently removed from the search to be admissible. In the present case, other valid leads were possessed by the police. See Brookins, 614 F.2d at 1037 (5th Cir.1980) (witness's identity and testimony could be traced to defendant's telephone list and traffic citation as well as to defendant's disclosure of witness's name during illegal interrogation; suppression not required). As the court observed in Brookins:
Deterrence is only marginally served by suppression of testimony derived from illegally obtained evidence if such testimony would have been discovered without the illegal actions, because the motivation for the illegal search or interrogation was not the quest for derivative evidence that the police were already *248 pursuing and would probably have been discovered in any event.
Id. at 1047. This rationale is especially relevant here. "There is simply no blanket `but for' test which results ipso facto in the exclusion of all testimony which is causally related to an illegal search or seizure." State v. Maier, 378 So.2d 1288, 1290-91 (Fla. 3d DCA 1979).
We find that the trial court misapplied the Ceccolini test when it ordered suppression of Y.B.'s testimony. The trial court also erred by overlooking the applicability of the independent source doctrine to this case. "The independent source doctrine teaches us that the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position than they would have been in if no police error or misconduct had occurred." Nix, 467 U.S. at 443, 104 S.Ct. at 2509, 81 L.Ed.2d at 387. Suppression of Y.B.'s testimony would obviously put the police in a worse position than they would have been in absent the illegal search and interrogation. The unlawful intrusions did not lead directly to the witness but instead involved a circuitous route through Griffith's ex-wife who would have been questioned regardless of the seizure of her photograph or her identification by Griffith. While the evidence unlawfully obtained may have encouraged the police to continue their investigation, there is nothing in the record to suggest that the search for Y.B. as a witness to testify against Griffith would have been terminated if the illegal search or interrogation had not occurred.[5]
Because we find that the trial court erred in judging the admissibility of Y.B.'s testimony only in terms of the inevitable discovery and attenuation exceptions to the exclusionary rule and not in terms of the independent source exception, we reverse the order suppressing Y.B.'s testimony.
Reversed.
NOTES
[1] This cause is also before this court on Griffith's motion for review of denial of bail and petition for writ of habeas corpus. Because we reverse the suppression order regarding the critical testimony of Y.B., we need not address Griffith's claim that the state's case against him is so weak that the requisite presumption of guilt is lacking and release from incarceration is mandated.
[2] Primary evidence is that evidence actually seized during an illegal search or seizure; secondary or derivative evidence is the indirect product of an illegal search or seizure. "The exclusionary prohibition extends as well to the indirect as the direct products of such invasions." Wong Sun v. United States, 371 U.S. 471, 484, 83 S.Ct. 407, 416, 9 L.Ed.2d 441, 453 (1963) (quoting Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920)).
[3] In Ceccolini the Supreme Court emphasized that the willingness of the witness to testify was one factor to examine in determining whether the taint of unlawful police conduct had been dissipated. The Court concluded that the testimony given by the witness in the case before it "was an act of her own free will in no way coerced or even induced by official authority...." 435 U.S. at 279, 98 S.Ct. at 1062, 55 L.Ed.2d at 279.
[4] The trial court specifically rejected the state's theory that it would have inevitably located Y.B. by lawful means. The court dismissed the state's "speculation" regarding what Detective Callejas "could have" or "would have" done to locate Y.B. The state and the trial court have confused the distinctive concepts of inevitable discovery and independent source, doubtless because the state has marshalled its arguments under the inevitable discovery label. That doctrine seems inapplicable to the facts before us because of the requirement "that at the time of the constitutional violation an investigation was already under way," Nix v. Williams, 467 U.S. 431, 457, 104 S.Ct. 2501, 2516, 81 L.Ed.2d 377, 396 (1984) (Stevens, J., concurring). Clearly, the police here had not initiated their search for Y.B. prior to their search of Griffith's home and their interrogation of him.
[5] Our conclusion that Y.B.'s testimony withstands fourth amendment scrutiny is further supported by a comparison with "fingerprint" cases. Even where an accused's fingerprints have been taken under questionable circumstances, courts have deemed the fingerprints admissible where other valid methods for obtaining the fingerprints existed. See Davis v. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969) (admission of defendant's fingerprints into evidence improper where fingerprints taken during dragnet of youths in area who were detained and fingerprinted without warrant or probable cause), on remand, Davis v. State, 255 So.2d 916 (Miss. 1971) (victim's in-court identification of defendant not tainted by prior police misconduct where it was based on independent source), cert. denied, 409 U.S. 855, 93 S.Ct. 191, 34 L.Ed.2d 99 (1972); Hayes v. Florida, 470 U.S. 811, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985) (fourth amendment violated where defendant detained and fingerprinted without warrant or probable cause), on remand, Hayes v. State, 488 So.2d 77 (Fla.2d DCA) (defendant's fingerprints admissible despite fact that they were taken during unconstitutional detention where fingerprints met inevitable discovery and independent source exceptions), cert. denied, ___ U.S. ___, 107 S.Ct. 119, 93 L.Ed.2d 65 (1986).