ON MOTION FOR REHEARING

SHEPHERD, C.J.
These consolidated cases are back before the Court on the State’s motion for rehearing in Case No. 3D08-1079 (lower tribunal number 07-10526A). By opinion filed May 1, 2013, we granted the State of Florida’s motion for rehearing in Case No. 3D08-1077 (lower tribunal number OS-37152) and denied the State’s motion for rehearing in Case No. 3D08-1079 (lower tribunal number 07-10526A). We now grant the State of Florida’s motion for rehearing in Case No. 3D08-1079 (lower tribunal number 07-10526A) and reverse the trial court order granting the motion to suppress in that case as well. We substitute the following opinion for that issued on May 1, 2013.[1]
*56 This is the State’s consolidated appeal of adverse rulings in two suppression hearings involving the same defendant, Manuel Ojeda. Ojeda’s business is hydroponic marijuana farming. He had an extensive criminal history, including at least six felony and misdemeanor convictions, before his arrest in Case No. 05-37152. He is well known to the local authorities, down to the type of vehicle he drives. Miami-Dade County Police Department Detective Edward Orenstein was the sole State witness at each suppression hearing. We treat the State’s appeal from each order in turn.
Case No. 05-37152
On November 30, 2005, Detective Oren-stein received an anonymous tip that marijuana was being grown at a private residence located at 7621 S.W. 136th Avenue, Miami-Dade County, Florida. A background check on Ojeda — who Orenstein had been investigating as a suspect in the grow house business and who Orenstein apparently knew or learned either owned, resided at, or otherwise was associated with the residence — revealed Ojeda’s prior felony and misdemeanor offenses. Armed with this information, Orenstein, along with three other detectives, one sergeant, and two uniformed officers, went to Oje-da’s residence at 7:45 a.m. that morning.
Orenstein and one other detective went to the front door. Two uniformed officers were standing on the sidewalk at the front of the residence, about twenty to thirty feet from the front door, their marked police cars parked behind them at the side of the road. The officers and their vehicles were visible to anyone who chose to look out of the residence. The other three detectives were deployed around the sides of the house, prepared to stop any fleeing suspects.
Ojeda, who had just gotten out of bed, responded to Detective Orenstein’s knock on the front door. According to Orenstein, when Ojeda opened the door, Orenstein explained the purpose of his visit, in response to which Ojeda replied, “Come on inside.” As Detective Orenstein and his colleague at the door entered the house, the three detectives emerged from the sides of the house and also entered. All five detectives were dressed in plain clothes, covered by a vest with the word “Police” across the front, and a badge and identification hanging around their necks. No guns were drawn, and no insistent statements or threats were uttered by any detective.
Once inside the house, Orenstein read Ojeda the warnings required by Miranda[2] to be given to a person in custody and asked Ojeda whether he understood them. Ojeda responded in the affirmative and, according to Orenstein, was “willing to cooperate with me with whatever I asked.” Thereupon, Orenstein asked whether Oje-da would consent to a search. Ojeda agreed and signed a consent form to search the house, adding, “Come, I’m going to show you around the house.” As the detectives were going through the house, Orenstein additionally asked for consent to search the vehicles in the driveway. According to Orenstein, Ojeda responded, “Yes, sure,” which response was confirmed by the execution of yet another consent form.[3] Ojeda ultimately led the detectives into the garage, where they encountered a marijuana hydroponics grow operation. Ojeda claimed he recently had moved back into the house, after having leased it to someone, and found the garage *57 in this condition. He could neither produce the name of the lessee or a lease, nor had he called the police regarding his find. Ojeda did not appear scared, under the influence of any narcotics, to have any mental issues, or to have issues of understanding during the encounter. Orenstein described Ojeda’s demeanor as “confident that whatever he was going to tell me about a tenant being in the house,” would be credible. There was no evidence of odor detection before the door to the garage was opened.
The trial court granted the motion to suppress on the ground consent to search the premises was unlawfully procured through an overwhelming show of police authority, exacerbated by an unnecessary administration of Miranda on the defendant. The trial court also held Orenstein’s testimony was not credible. On de novo review, according a presumption of correctness to the trial court’s finding of historical facts, as we are required to do, we conclude the defendant’s consents to search were objectively voluntary. We also conclude the trial court erred in finding Detective Orenstein’s testimony not credible.
Whether consent is freely and voluntarily given is determined by the totality of the circumstances. Taylor v. State, 355 So.2d 180, 183 (Fla. 3d DCA 1978) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 227-29, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)); see also State v. Othen, 300 So.2d 732, 733 (Fla. 2d DCA 1974). The factors to be considered include the age and maturity of the accused; whether he had a prior criminal history; the time and place of the encounter; the number of officers; whether the defendant executed a written consent form; the length of time police interrogated him before he consented; whether he was in custody; and the words and actions of the officers. Miller v. State, 865 So.2d 584, 587 (Fla. 5th DCA 2004) (citing United States v. Broomfield, 201 F.3d 1270, 1274 (10th Cir.2000); United States v. Glass, 128 F.3d 1398, 1406 (10th Cir.1997)). In conducting our review, we accord a presumption of correctness to the trial court’s findings of historical facts where there is substantial competent evidence to support them. State v. Glatzmayer, 789 So.2d 297, 301 (Fla.2001). However, our application of the law to the facts, including our determination of whether the defendant’s consent was objectively voluntary, is de novo. Id. Finally, because a home is an area in which a person enjoys the highest reasonable expectation of privacy, we scrutinize the factors with special care. Payton v. New York, 445 U.S. 573, 585, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); Gonzalez v. State, 578 So.2d 729, 732 (Fla. 3d DCA 1991).
In this case, the trial court relied on only three factors to conclude the consent to search was involuntary: (1) the time and place of the encounter; (2) the number of officers; and (3) the words and actions of those officers. A full analysis of all the factors, as required by law, mandates a reversal of the order entered by the trial court in this case.
First, Ojeda’s age, thirty-four at the time of the search, suggests he was of sufficient maturity and experience to make an intelligent decision. Second, there is no evidence he was intoxicated or otherwise impaired. Third, Ojeda executed a written consent form that was in English, after being asked whether he wanted it in English or Spanish. See Luna-Martinez v. State, 984 So.2d 592, 600 (Fla. 2d DCA 2008) (“[T]he presence of a written consent tends to support the conclusion that the consent was given voluntarily.”). Fourth, Ojeda had a prior criminal history, creating a presumption *58 he knew his rights. See Wilson v. State, 952 So.2d 564, 570 (Fla. 5th DCA 2007) (“[W]hether he had a prior criminal history — the presumption being that one who has prior criminal arrests knows his legal rights .... ”). Fifth, Ojeda was read the warnings required by Miranda prior to executing the written consent. Although the warnings were unnecessary, see Davis v. State, 698 So.2d 1182, 1189 (Fla. 1997) (“Miranda warnings are required whenever the State seeks to introduce against a defendant statements made by the defendant while in custody and under interrogation. Absent one or the other, Miranda warnings are not required.”), recent authority from our supreme court has recognized that, depending on the circumstance, an unneeded administration of Miranda warnings can be more protective of an individual’s rights than intimidating in nature. See Caldwell v. State, 41 So.3d 188, 201 (Fla.2010); see also Ladson v. State, 63 So.3d 807, 809 (Fla. 3d DCA 2011) (“[T]he administration of Miranda warnings, as a matter of law, does not transform a consensual encounter into a seizure.”); accord Ruiz v. State, 50 So.3d 1229, 1232 (Fla. 4th DCA 2011). Upon consideration of the totality of the circumstances of this case, we conclude the administration of Miranda warnings to Ojeda did not compromise his decision-making faculties. Although the warnings given him were not tailored to a consent to search, he was advised he had the right to counsel and the right to terminate the encounter at any time. He never elected to terminate the encounter. Rather, he communicated with the authorities in a cooperative spirit from the moment he opened the front door.
Sixth, Ojeda was not deprived of any convenience or sequestered for an undue length of time prior to signing the consent. The Miranda administration took just a few minutes. Ojeda then volunteered to “cooperate with whatever [he was] asked.” Detective Orenstein then asked him to sign the consent form. Ojeda did so upon the first request. He read the form himself before signing. The search of the house began immediately thereafter. There is no evidence Ojeda was under undue stress.[4] In fact, the evidence in this case reveals Ojeda signed an additional consent form to expand the scope of the search while it was ongoing. This provides at least some further support for the inference that the consent was voluntary.
Seventh, that the encounter between the police and Ojeda took place on Wednesday, November 30, 2005, at 7:45 a.m., is a factor in favor of the State’s position. The officers did not arrive in the middle of the night. Seven forty-five on a Wednesday morning is the usual time ordinary business or working people are getting ready for work or eating breakfast. It might be that Ojeda’s business is more nocturnal in nature than others. However, he has no greater constitutional right to sleep in than anyone else.
Lastly, there was no overwhelming display of force in this ease. Detective Orenstein testified he and just one other detective were at the door, and that the other three detectives emerged and entered the house after Orenstein and his *59 companion were invited to enter. Ojeda was read his Miranda rights and the consent to search requested. Ojeda’s counsel argues the presence of five officers in the house at the time the consent to search was requested, together with the presence of two uniformed officers on the sidewalk, overpowered Ojeda’s decision-making faculties. We disagree on the facts in this case.
The inherent danger involved in a narcotics investigation compels the use of caution. It seems entirely reasonable to order a complement of seven law enforcement officers to investigate a tip of this nature. In fact, it would seem irresponsible not to send at least two persons to the front door. Only in retrospect do we know what awaited Orenstein and the other detective who accompanied him to the door. Case law is replete with examples of circumstances where no show of force has been found to exist under similar facts. See, e.g., United States v. Thompson, 524 F.3d 1126, 1133 (10th Cir.2008) (finding the presence of three officers did not, by itself, render consent involuntary); United States v. Thomas, 430 F.3d 274, 276 (6th Cir.2005) (concluding presence of four officers, without more, did not render consent involuntary); United States v. Ramirez-Chilel, 289 F.3d 744, 751 (11th Cir. 2002) (stating the presence of five officers did not render consent involuntary); United States v. Pena, 143 F.3d 1363, 1367 (10th Cir.1998) (stating presence of four officers, including three that were armed, who came to defendant’s motel room, found not to render consent involuntary); United States v. Padilla-Pena, 129 F.3d 457, 467 (8th Cir.1997) (concluding presence of three officers did not render consent involuntary); United States v. Garcia, 56 F.3d 418, 423 (2d Cir.1995) (finding the presence of three officers did not render consent involuntary); United States v. Iribe, 11 F.3d 1553, 1557 (10th Cir.1993) (finding that presence of five officers did not render consent per se involuntary); United States v. Durades, 929 F.2d 1160, 1166-67 (7th Cir.1991) (stating presence of three officers, who acted professionally at all times, in one apartment with three occupants, was not coercive); Luna-Martinez, 984 So.2d at 600 (stating presence of three to four officers outside defendant’s apartment did not render consent per se involuntary); State v. Triana, 979 So.2d 1039, 1044-45 (Fla. 3d DCA 2008) (finding presence of four officers did not render consent involuntary); Wilson v. State, 952 So.2d 564, 570 (Fla. 5th DCA 2007) (finding presence of three officers who had trespassed onto property and initially accosted defendant at gunpoint did not vitiate consent to search given after time passed); Putnel v. State, 746 So.2d 521, 523 (Fla. 2d DCA 1999) (finding presence of two officers did not render consent involuntary). In fact, most authorities opine it is not so much the police presence that upends an otherwise lawful police action, such as the one reviewed here, but rather the verbal acts of those officers. See, e.g., Lunar-Martinez, 984 So.2d at 600 (“A suspect is more likely to be overawed by one officer speaking in an insistent, demanding tone than is a suspect who is addressed in a low-key manner in an encounter with several officers.”). There is no evidence in this case that any of the law enforcement personnel on the premises did or said anything a reasonable person would understand as an assertion of authority to search.
We also conclude the trial court erred by finding Detective Orenstein’s testimony was not credible. Although the evidentiary hearing in this case was one of three such hearings directly or indirectly involving Detective Orenstein, held in tandem by the trial judge on the same day, and while taken together the trial judge *60 appropriately had some cause for concern about Detective Orenstein’s credibility, counsel agreed at the beginning of the hearings that each matter would proceed and be argued “case by case.” Although defense counsel argued Detective Oren-stein was not a credible witness, he introduced no evidence impeaching or contradicting Orenstein’s testimony in this case. The long-settled law of this District is that in a suppression hearing context, the trial judge must accept any evidence by a police officer “which is neither impeached, discredited, controverted, contradictory within itself, or physically impossible.” See State v. Fernandez, 526 So.2d 192, 193 (Fla. 3d DCA 1988) (“Although the trial judge purported to find the testimony of the officers at the motion to suppress ‘not credible,’ he was not free to do so.”) (citing Flowers v. State, 106 Fla. 686, 143 So. 612 (1932); Brannen v. State, 94 Fla. 656, 114 So. 429 (1927); Harris v. State, 104 So.2d 739 (Fla. 2d DCA 1958)). The record in this case does not reveal any evidence that the testimony of Orenstein met any of the criteria by which it could have been discounted by the trial judge, and the trial judge cites no such evidence. For all of these reasons, we reverse the order granting the motion to suppress in Case No. 05-37152.
Case No. 07-10526A
Case No. 07-10526A can be treated with greater dispatch. The record in this case reveals that on March 23, 2007, eighteen months after Detective Orenstein and his squad conducted their warrantless search of Ojeda’s residence, located at 7621 S.W. 136th Avenue, they travelled to a nearby residence where Orenstein believed Ojeda might be found, for the purpose of arresting him on ten-day-old charges on another grow house case, Case No. 07-10525, if Ojeda answered the door.[5] Detective Willie Knapp, the lead investigator on that case, was in the process of obtaining a warrant for Ojeda’s arrest, but it had not yet been secured at the time of Detective Orenstein’s arrival at the house.
Nevertheless, accompanied by Officer Benjamin, Detective Orenstein knocked on the front door of the house. Ojeda answered. An unmistakable odor of marijuana wafted across the threshold. Without asking permission, Orenstein and Benjamin entered the house and handcuffed Oje-da. Confronted by conflicting statements by Ojeda and suspicious sounds, Detective Orenstein next performed a protective sweep of the house for officer safety, producing an additional arrest. The grow house, which resulted in the charges that spawned the subject of the motion to suppress, was discovered in a second sweep of the house, conducted five or ten minutes later, once additional backup officers arrived. After a few hours, Detective Oren-stein obtained a warrant and seized the contraband. The trial court granted Oje-da’s motion to suppress the physical evidence seized from the house.
As in Case No. 05-37152, the trial court had serious doubts about the credibility of Detective Orenstein in many respects, including whether he spoke to Detective Knapp before or after he arrested Ojeda, and whether Officer Orenstein’s protective search of the house was truly based upon suspicious sounds emanating from another location in the house. However, Case No. 07-10526A is a single witness case. Detective Orenstein’s testimony that he smelled the odor of the marijuana at the threshold before he entered the house is neither *61 contradicted nor impeached in the record. As in Case No. 05-87152 discussed above, the record does not reveal any evidence that Detective Orenstein’s testimony that he smelled marijuana immediately upon Ojeda’s opening of the front door met any of the criteria by which it could have been discounted by the trial judge, and the trial judge cites no such evidence. See State v. Fernandez, supra; see also State v. Dickson, 35 So.3d 1027, 1027 (Fla. 3d DCA 2010); State v. Wong, 990 So.2d 1154,1156 (Fla. 3d DCA 2008); State v. Casey, 821 So.2d 1187, 1188 (Fla. 3d DCA 2002); Cordero v. State, 669 So.2d 1075,1076 (Fla. 3d DCA 1996); State v. G.H., 549 So.2d 1148,1149 (Fla. 3d DCA 1989).
Moreover, Detective Orenstein and Officer Benjamin had every right to proceed to the front door of the house where Detective Orenstein thought Ojeda might be found. It was Detective Oren-stein’s intent as he approached the house to arrest Ojeda on the charges in the Knapp case if Ojeda was there. The record is devoid of any evidence that Detective Orenstein or Officer Benjamin approached the house with the intent of committing an unlawful act. “Under Florida law, one does not harbor an expectation of privacy where salesmen or visitors may appear.” See State v. Morsman, 394 So.2d 408, 409 (Fla.1981). In addition, as we recently stated, “The fact that a consensual encounter occurs at the entrance of an individual’s home does not call into question or in any way lessen the propriety of a consensual encounter.” State v. Triana, 979 So.2d 1039, 1043 (Fla. 3d DCA 2008). Thus, in such a circumstance, a police officer not armed with a warrant may approach a home and knock, precisely because, as the United States Supreme Court pronounced in Florida v. Jardines, — U.S. —, 133 S.Ct. 1409, 1416, 185 L.Ed.2d 495 (2013) (quoting Kentucky v. King, — U.S. —, 131 S.Ct. 1849, 1862, 179 L.Ed.2d 865 (2011)), “that is ‘no more than a private citizen might do.’ ” Detective Orenstein’s excursion to the front door of Ojeda’s house in the company of Officer Benjamin was a lawful consensual encounter.
Finally, the defense argues that the physical evidence discovered in the second sweep of the house was illegally retrieved because it occurred after an illegal entry into the home by Detective Orenstein upon the opening by Ojeda of his front door. The State concedes that Detective Oren-stein’s entry into Ojeda’s home was illegal. However, that is not the end of the inquiry.
The United States Supreme Court consistently has held that the “exclusionary rule” has no application where the government can show it has learned of the challenged evidence from an “independent source.” The rule applies where the illegal search or seizure was not an actual cause of the discovery of the subject evidence. Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920). The Court stated:
The essence of [the Fourth Amendment] provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others ...
Id. (emphasis added); see also Murray v. United States, 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988); Segura v. United States, 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984); see generally Phillip A. Hubbart, Making Sense of Search and Seizure Law 344-345 (2005); *62 Wayne LaFave, Search and Seizure 260-65 (4th ed. 2004).
This court has had no hesitation in applying the independent source rule where appropriate. For example, in State v. Mosier, 392 So.2d 602 (Fla. Bd DCA 1981), we concluded that a search by plain clothes detectives of a suitcase checked by Mosier at a Continental Airlines ticket counter was lawful, despite the fact Mosier had earlier refused them permission to search the suitcase during the course of an illegal Terry stop.[6] Mosier, 392 So.2d at 604. Although the detectives examined Mosier’s flight ticket and utilized the claim check number obtained during the illegal encounter to verify the bag in the airport loading area, we held that so long as the bag would not have become inaccessible in the loading area in the ordinary course while the warrant was being obtained (e.g., taken to and loaded on the airplane),[7] the ultimate search of the bag revealing two kilos of cocaine was valid because the suitcase was opened pursuant to a search warrant secured, using evidence legally discovered through the operation of an independent source: visual characteristics of the bag observed by the detectives in the possession of Mosier before he checked it at the ticket counter. Id. at 604-05. Thus, we held, “whether Mosier was previously ‘stopped’ or not, legally or illegally, [was] of no consequence.” Id. at 604.
State v. Griffith, 500 So.2d 240 (Fla. 3d DCA 1987), issued by this Court a few years after Mosier, provides an even more cogent example of the operation of the independent source rule. In Griffith, we concluded that the State had not one, but at least three alternative methods of discovering the identity of an underage victim of sexual battery and lewd assaults than the method Griffith contended was “a product of police illegalities.” Id. at 242. There, a former employee of Griffith advised Miami police that Griffith was actively involved in photographing young girls in the nude in his office for pay. Id. at 241. The employee referred police to a coworker for additional details. Id. Based upon this investigation, the police obtained a warrant to search Griffith’s office and seized numerous photographs of nude young girls from a file cabinet. Id. Y.B. was featured in some of these photographs. Id. Police also seized an address book which contained a listing for Y.B.’s mother. Id. Griffith was arrested and advised of his rights pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Id.
When Griffith expressed reluctance to consent to a search of his home, the police responded by threatening to get a search warrant and suggesting that Griffith’s dog would have to be destroyed if it interfered with their entry and search. Id. Griffith signed a consent to search form. Id. The ensuing search yielded three photographs, two of which were of Y.B. and one of an adult female. Id. At the time the photographs were seized, police were not aware of the identities of any of the subjects of the photographs. Id.
Griffith was subsequently transported to the police station where he was again Mir-andized and asked to sign a waiver form for purposes of questioning. Id. Griffith signed his initials by each paragraph of the form except the paragraph stating, “I am willing to answer questions asked of me.” Id. Despite Griffith’s failure to approve the paragraph regarding questioning, Detectives Judith Turner and Oscar Sanchez *63 proceeded to interrogate him. Id. Griffith identified the woman’s photograph as his ex-wife, but denied knowing the girl’s identity. However, when confronted with a picture of the girl sitting in his lap, Griffith said he knew the girl’s mother, but refused to answer further questions. Id. at 241-242.
Detective Callejas began an investigation to ascertain the identity of the young girl. Id. at 242. He first questioned Griffith’s secretary, who gave him the name and occupation of Griffith’s ex-wife. Id. Griffith’s ex-wife was unable to identify the juvenile, but referred to Mrs. B. as an individual who might be able to identify the girl. Id. Detective Callejas then checked the listing for Mrs. B. in the address book secured from Griffith’s office and contacted her. Id. Ms. B. identified the girl as her daughter, Y.B., who at the time was fifteen-years old. Id. After interviewing Y.B. and obtaining an affidavit from her detailing the acts committed by Griffith, Griffith was charged with eight counts of sexual battery and nine counts of lewd assault. Id.
In his motion to suppress evidence, statements and witness testimony, Griffith sought suppression of (1) items seized from his office; (2) items seized from his home; (3) statements made by Griffith at the police station; and (4) the testimony of Y.B. Id. After an evidentiary hearing, the trial court ruled that the search of Griffith’s office pursuant to the search warrant was valid, the search of the house was unlawful, that Griffith’s statements were elicited in violation of his Miranda rights; and the testimony of Y.B. was “a derivative product of police illegalities.” Id. The trial court granted Griffith’s suppression motion as to the evidence seized from his home, the statements made at the police station, and the testimony of Y.B. Id.
The narrow issue on appeal was whether the trial court properly deemed the testimony of Y.B. a derivative fruit of police misconduct. Id. Griffith argued that because the pictures found during the illegal search of the home were utilized to question him, and during the illegal questioning he provided the police with the name of his ex-wife, the identification and testimony of Y.B. was the direct product of the two illegalities. Id. After an exhaustive review of the exceptions to the exclusionary rule,[8] we found the illegal search of the home and unlawful questioning of Griffith to be of no consequence. We reasoned:
In the instant case the police had at least three alternative methods which would have led to the identity of Y.B. apart from the illegal search of Griffith’s home and his improper interrogation. As the state correctly posits, it could have learned Y.B.’s identity in the following ways. First, by questioning Iris Rodriguez, the police learned the name and occupation of Griffith’s ex-wife, Terry Macannon, thereby rendering Griffith’s revelation of his ex-wife’s identity through the photograph seized from his home merely gratuitous. Since Terry Macannon provided the link to Mrs. B. and hence to Y.B., the police already had *64 a legitimate method of reaching Terry Macannon. Next, the state points out that, in the course of a regular police investigation of Griffith, the existence of Griffith’s ex-wife would have come to light and the trail to Y.B. would have been uncovered. The last alternative by which the police could have found Y.B. concerns the address book and photograph of Y.B. taken from Griffith’s office under a valid search warrant. By showing the photograph to each person listed in the address book, the police would have ultimately approached Mrs. B. as one of the entries in the book. Mrs. B. would have identified her daughter’s photo and afforded the police access to Y.B.
Id. at 246-246.
Finally, we find Jackson v. State, 1 So.3d 273 (Fla. 1st DCA 2009), to be instructive on the facts of our case. As in the Griffith case, the illegal police activity in Jackson emanated from improprieties occurring where courts uniformly give the greatest degree of Fourth Amendment scrutiny, a person’s residence. In Jackson, two police officers, acting on information provided by a burglary victim that Jackson was the perpetrator, pointed out his mother’s home, where it was thought Jackson could be found. Id. at 276. The officers followed a trail of footprints from the burglary victim’s home to Jackson’s mother’s home where they observed Jackson standing very still in an open shed. Id. Believing Jackson was attempting to escape their notice, the officers approached Jackson, and after he lied to them about his name, arrested him for giving a false name. Id. A search of Jackson’s person produced a crack pipe. Id. at 277. Because the arrest for giving a false name was unlawful, see Dubois v. State, 932 So.2d 298, 299 (Fla. 2d DCA 2006) (stating the giving of a false name is not a crime unless it occurs during a lawful detention or arrest); see also § 901.36(1), Fla. Stat. (2007), the discovery of the crack pipe was the product of an illegal search. Id. Moments after Jackson’s arrest, however, Jackson’s mother gave the officers consent to search the shed. Id. That search produced a shotgun taken in the burglary and some shotgun shells. Jackson was then arrested for armed burglary as well. Id.
Jackson moved to suppress all the physical evidence obtained by police during the encounter, as well as some statements he made to police after the unlawful arrest, on the basis that all the evidence was recovered after the illegal first arrest. Id. The trial court denied Jackson’s motion in its entirety. Id. The First District Court of Appeal found that the statements made to police after the first arrest should have been suppressed because they were the fruit of the illegal arrest to which no exception applies. Id. at 279. However, the court found the discovery of the shotgun and shotgun shells did not result either directly or indirectly from Jackson’s initial arrest and that the crack pipe would have been inevitably discovered by the officers through lawful means unrelated to the illegal arrest. Id. at 278. The court reasoned:
[T]he mere fact that evidence is discovered after illegal conduct by a police officer is an insufficient basis for suppression. Instead, it must be contended that the evidence is “in some sense the product of illegal government activity.” Nix v. Williams, 467 U.S. 431, 443, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) (quoting United States v. Crews, 445 U.S. 463, 471, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980)). Even when a Fourth Amendment violation has occurred, evidence should be suppressed only if it “has been come at by exploitation of the illegality” and was not obtained “by means suffi *65 ciently distinguishable to be purged of the primary taint.” Wong Sun v. United States, 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).
Id. at 278. Based upon these principles, the court determined that the items found in the shed were admissible under the independent source exception to the exclusionary rule. Id. The State presented undisputed testimony that Jackson’s mother, the owner of the property, gave consent to the officers to search the shed. Id. at 279. Thus, this court held, “even if [the officer] believed the arrest gave him justification for searching the shed, the consent from appellee’s mother removed the taint of the arrest, making the shotgun and shells admissible at trial.” Id. at 279.
As to the crack pipe, the First District Court of Appeal found it to be admissible under the inevitable discovery doctrine, a concept closely related to the independent source rule. Id. Unlike the independent source rule, which the First District explained “applies when evidence is discovered as a result of unlawful police activity but is also discovered independently through a lawful investigation that occurs either before or after the illegal activity, so long as the independent investigation [itself] is ‘untainted by the initial activity,’ ” Id. at 278 (quoting Murray v. United States, 487 U.S. 533, 537, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988)), under the inevitable discovery doctrine, “ ‘evidence otherwise subject to suppression can be admitted if the State shows that the officers “ultimately would have discovered the evidence independently of the improper police conduct by ‘means of normal investigative measures that inevitably would have been set in motion as a matter of routine police procedure.’ ” Id. at 279 (citing McDonnell v. State, 981 So.2d 585, 591 (Fla. 1st DCA 2008)). Based upon this principle, the First District Court of Appeal reckoned that “after finding the shotgun, the officers would have arrested [Jackson] for the burglary, and a search incident to arrest would have revealed the crack pipe, thus properly making it admissible at the trial of the case” while simultaneously finding that “[i]t would be too speculative to conclude [Jackson] would have provided the same incriminating statements to the officers if he had been arrested after the search of the shed.” Id.
In Case No. 07-10526A before us, there is no need for speculation. It is not disputed Detective Orenstein detected the unmistakable smell of marijuana the moment Ojeda opened the door to the residence where he was found. Based upon that evidence and observations made during the second unlawful sweep of the house, Detective Orenstein obtained a warrant to search the house. The affidavit executed by Detective Orenstein to obtain the search warrant plainly stated that “ ‘Upon knocking at the front door of ‘The Premises!,]’ Subject Ojeda answered the door, [and] Your Affiant could smell the odor of marijuana emanating from inside ‘The Premises.’ ” This discovery occurred during the course of “a lawful investigation” conducted by Detective Orenstein to effect the arrest of Ojeda on another case before the occurrence of the illegal activity. The smell alone entitled Detective Or-enstein to a warrant to search the premises. See State v. Roman, 103 So.3d 922, 925-26 (Fla. 2d DCA 2012) (finding the smell of marijuana through an open door was sufficient to establish probable cause for a warrant); State v. Pereira, 967 So.2d 312, 314 (Fla. 3d DCA 2007) (finding even without evidence of a dog sniff, an officer smelling marijuana from a house demonstrates sufficient probable cause to support the issuance of a warrant); United States v. Tobin, 923 F.2d 1506, 1512 (11th Cir. 1991) (“There is no doubt that the agent’s suspicions rose to the level of probable *66 cause when, as the door stood open, he detected what he knew from his law enforcement experience to be the odor of marijuana”). As in Mosier, Griffith and Jackson, there existed an independent basis for the discovery of the contraband evidence. The independent source rule applies to purge the discovery of the evidence in this case from any illegal taint.
For these reasons, we reverse the order of the trial court in Case No. 07-10526A as well.
SUAREZ, J., concurs.

. The defendant did not file a motion for rehearing in Case No. 3D08-1077. Thus, the decision and opinion of the Court in that case are final in this court. We restate the opinion in that case here for convenience of the reader.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. The search of the vehicles was non-productive.

. To some extent, any encounter with an officer of the law may lead to some apprehension. See Oregon v. Mathiason, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (“Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is a part of a law enforcement system which ultimately may cause the suspect to be charged with a crime.”). However, this fact alone cannot support a seizure under the Fourth Amendment. See Terry v. Ohio, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

. At the time, Ojeda was on probation in Case No. 05-37152 pursuant to a plea. The plea was subsequently vacated.

. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

. Because the evidence was insufficient in this point, we remanded the case for further proceedings, solely on the seizure issue.

. It is commonly stated that there are three exceptions to the otherwise harsh natural workings of the exclusionary rule. Evidence otherwise excludable under the rule may nevertheless be admitted if the State can show that (1) an independent source existed for the discovery of the evidence, Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920); (2) the evidence would have inevitably been discovered in the course of a legitimate investigation, Nix v. Williams, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); or (3) sufficient attenuation existed between the challenged evidence and the illegal conduct, Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).