NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

JORGE AGUILAR,                          )
                                        )
            Appellant,                  )
                                        )
v.                                      )       Case No. 2D17-4086
                                        )
STATE OF FLORIDA,                       )
                                        )
            Appellee.                   )
                                        )
_____ )

Opinion filed November 14, 2018.

Appeal from the Circuit Court for Manatee
County; Brian Iten, Judge, and Stephen L.
Dakan, Senior Judge.

Howard L. Dimmig, II, Public Defender, and
Rachel Roebuck, Assistant Public Defender,
Bartow, for Appellant.

Pamela Jo Bondi, Attorney General,
Tallahassee, and Peter Koclanes, Assistant
Attorney General, Tampa, for Appellee.


ATKINSON, Judge.

        Jorge Aguilar appeals the final judgment of conviction and sentence

adjudicating him guilty for possessing a firearm as a felon based upon his nolo

contendere plea. He reserved the right to appeal the denial of his dispositive motion to

suppress the firearm that the police obtained after searching his home. Because the

State failed to establish that it discovered the weapon within the scope of the consent Mr. Aguilar voluntarily gave to search his home, we reverse.

On June 10, 2015, seven uniformed officers from the Manatee County Sheriff's Office arrived near Mr. Aguilar's duplex just after two o'clock in the morning in response to a 9-1-1 call that shots had been fired. The deputies were attempting to locate the source of the gunshots. There were at least six police cars parked in front of Mr. Aguilar's small duplex. Lieutenant Andrews spoke with a group of people standing in the street who indicated that the shots had come from the duplex. There had been another shooting at the same address a few weeks earlier, during which someone was shot and injured.

At the hearing on Mr. Aguilar's motion to suppress, seven law enforcement officers testified—Deputy Murges, Deputy Bichsel, Officer Schmitt, Lieutenant Andrews, Deputy Schwartz, Detective Johnson, and Detective Lidell. Deputies Murges, Bichsel, and Schwartz, along with Officer Schmitt and Lieutenant Andrews, were among the seven initial responders. Three detectives arrived approximately twenty minutes later, between 2:28 and 2:35 a.m. according to a crime scene log created by Deputy Murges.[1]

Lieutenant Andrews testified that when he first arrived on scene he saw Mr. Aguilar walking nervously around outside of the duplex. He decided to order an initial security sweep:

> Based on the prior incident at the house a week or two before, the fact that odor of gunpowder present in the immediate area, when [Mr. Aguilar] opened the door, there was the haze of burnt gunpowder smoke, I can see a shell

---

[1]The "Crime Scene Contamination Log," referred to by witnesses as the "crime scene log," is a form that lists the names of the law enforcement officers and the times at which they arrived at and departed from the crime scene.

casing lying on the floor from being out in the driveway, which did lead me to believe that there was obviously an exchange of gunfire and there was a potential that someone could have been hit and still inside.

At least four of the initial responders participated in the sweep—Deputies Murges, Bichsel, and Schwartz, along with Lieutenant Andrews, who supervised the deputies. Meanwhile, Officer Schmitt questioned Mr. Aguilar outside.

According to Deputy Murges, the sweep occurred within a few minutes after they arrived on scene. Once inside the residence, four deputies testified that they observed shell casings in the living room and smelled gunpowder. Deputy Bichsel went into a bedroom and observed rifle rounds scattered across the floor. Deputy Murges testified that he saw shell casings and bullet holes in the wall in the master bedroom, which he described as "the first bedroom on the left" and distinguished from "the other bedroom, which is just after that." He found Mr. Aguilar's girlfriend and children lying on the side of the bed "in the second bedroom that [he] checked." He testified that, after the deputies escorted the Mr. Aguilar's girlfriend and children out of the house, "we knew we had an actual shooting investigation to conduct." According to Deputy Murges, at this point, everyone was cleared out of the house and the area was sealed, and the house remained empty until the detectives arrived.

However, Lieutenant Andrews testified that he permitted Mr. Aguilar and his girlfriend to go back into the duplex to retrieve some items for their baby; he accompanied the couple into the duplex along with two or three other deputies. Afterwards, Lieutenant Andrews ordered the deputies not to go back into the house until the detectives arrived.

Detective Johnson testified that upon his arrival he briefly spoke with Lieutenant Andrews in the driveway, entered the residence without "break[ing] stride," and directed everyone to leave in order to secure the scene and begin his investigation—testimony suggesting that law enforcement officers or others might still have been inside the home upon his arrival. The crime scene log indicated that Detective Johnson arrived on scene at 2:28 a.m., but he testified that he thought that it was earlier. Detective Johnson testified that he entered the residence "to get everybody out and secure the crime scene, and then to begin our investigation," adding that "[t]here has to be some sort of a fact-finding, look at everything to see what kind of crime that occurred, what's the evidence, at least initially, however very brief, what do we have on scene." He also testified that this entry was not part of the protective sweep.

Detective Liddell testified that he arrived on scene (at 2:35 a.m., according to the crime scene log) and was briefed by Detective Johnson. Detective Liddell then asked Mr. Aguilar to walk him through the house and show him what had happened, and Mr. Aguilar obliged. Mr. Aguilar did not challenge the trial court's finding that Detective Liddell's reentry into the home was consensual.

Mr. Aguilar explained that he was sleeping in the back room on the floor with his girlfriend and children because he had "been targeted previously several times as a shooting victim." Mr. Aguilar's girlfriend told Detective Liddell that she heard someone in the house. Mr. Aguilar got out of bed to check, and he "saw a black male climbing into the window or standing on the couch." The "person was shooting at him, so he went back into the room."

- 4 -

According to Detective Johnson's probable cause affidavit, he found "a loaded AK-47 style automatic assault rifle," which was "located just underneath the edge of the mattress in the master bedroom, where the defendant sleeps." Neither the State nor the defense adduced any testimony from Detective Johnson about the circumstances surrounding this discovery.

Lieutenant Andrews ordered Deputy Schwartz to obtain consent to search the home from Mr. Aguilar. Deputy Schwartz approached Mr. Aguilar, who was seated in a chair located in the carport about four to five feet from the front door. Deputy Schwartz testified that he read the consent form to Mr. Aguilar "word-for-word," told him he did not have to consent, and watched him sign the form at 2:47 a.m. The form contained the following: "I fully understand my constitutional rights in regard to the search and it is my intention to fully and completely waive such rights by this consent. I give this consent freely and voluntarily, without compulsion or threat of any kind."

By this time, there were ten officers at the scene; however, Deputy Schwartz testified that no one else was nearby when he obtained Mr. Aguilar's signature on the consent form. When asked whether there were any officers inside the duplex when he first approached Mr. Aguilar, Deputy Schwartz replied, "I don't recall knowing anybody was inside the house."

Mr. Aguilar testified that when Deputy Schwartz asked him to sign the consent form "in order to start an investigation," he initially refused because they had already taken "pictures of the crime scene, front bedroom, the window, the vase, the couch with the footprint on it, and [he] didn't see" any "reason why [he needed to sign] if they had already done their job." Then he explained that Deputy Schwartz approached

him again and told him that if Mr. Aguilar wanted them to start a burglary investigation, they needed him to sign the form. Mr. Aguilar testified that he told the deputy that it was just for "the front bedroom and the living room" and attempted to write that on the consent form but was rushed by the deputy. The words "just for" are written on the form. Deputy Schwartz testified that it was not his own writing. He did not recall telling Mr. Aguilar that it was necessary for him to sign the form in order for the scene to be processed; he testified that Mr. Aguilar did not express any concerns about signing the form and did not place any limitations on the scope of the search.

Detective Johnson's initial entry into the house did not produce the weapon in question. However, the legality of his entry, which occurred after the sweep but before consent was obtained, bears upon the State's burden to establish that the consent was voluntarily given.

When ruling on the defendant's motion to suppress the firearm, the trial court stated the following:

> And then it's my understanding from what appears to be the more convincing force and effect that . . . the house was sealed [after the retrieval of the supplies for the children]. Assuming for the moment that the Defense version that then Detective Johnson entered the house and that this rose to the level of an unlawful search is a little difficult for me to conclude. If he did go in, he was the detective, [and] . . . by his remarks, he went in there to decide kind of what do we have? Do we have an actual crime scene here, which apparently they correctly decided they did have, or do we have something else. And so I think his entry was justified. But even if you want to say that he had no moral, legal authority to go in and look around, he didn't find anything. . . . [I]f Detective Johnson went in before consent was given, he didn't find anything and he had a lawful purpose to be there—to see what kind of crime scene they had, but even if it was unlawful, he didn't find anything.

The court also noted the different versions of events regarding Mr. Aguilar's purported limitation on his consent. Mr. Aguilar's home consists of a living room on the left, a bedroom down a hallway to the left, and a bedroom further down the same hallway to the right. Mr. Aguilar initially described the rooms he consented to have searched as the "front bedroom and the living room." He later referred to it as the "master front bedroom." He referred to the other bedroom, which he claims he did not give consent to search, as the "back bedroom." Detective Liddell testified that the firearm was located underneath the bed in the first bedroom on the left and that the other bedroom on the right was the one where the family was sleeping. However, he stated that he did not locate the firearm himself; he was just told that it was found there. In the probable cause affidavit, Detective Johnson purports to have found the gun "located just underneath the edge of the mattress in the master bedroom, where the defendant sleeps." At the hearing, Detective Johnson testified that the family was sleeping in the back bedroom on the night of the shooting.

In challenging the denial of the motion to suppress, Mr. Aguilar argues that Detective Johnson's initial entry into the duplex was illegal, thereby rendering the subsequent consent presumptively involuntary. He argues that the State failed to rebut that presumption by proving the dissipation of the taint of the prior illegal conduct by clear and convincing evidence. And even if the State managed to meet this burden, Mr. Aguilar contends his consent to the search was involuntary based on the totality of the circumstances. He further argues that even if his consent was otherwise voluntary, the police exceeded the scope of the limited consent that he gave them. Therefore, he concludes, the exclusionary rule necessitated suppression of the firearm.

In reviewing a denial of a motion to suppress, an appellate court must defer to the trial court's factual findings but review its legal conclusions de novo.  Hardin v. State, 18 So. 3d 1246, 1248 (Fla. 2d DCA 2009) (citing Connor v. State, 803 So. 2d 598, 605 (Fla. 2001)).  This court will uphold a trial court's findings of fact "if supported by competent, substantial evidence."  C.L.L. v. State, 115 So. 3d 1114, 1116 (Fla. 1st DCA 2013) (citing Johnson v. State, 995 So. 2d 1011, 1013 (Fla. 1st DCA 2008)).

"A private home is an area where a person enjoys the highest reasonable expectation of privacy under the Fourth Amendment."  Vasquez v. State, 870 So. 2d 26, 29 (Fla. 2d DCA 2003); see also Payton v. New York, 445 U.S. 573, 585 (1980) (noting that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed" (quoting United States v. U.S. Dist. Court for E. Dist. of Mich. S. Div., 407 U.S. 297, 313 (1972))).[2]  "With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no."  Kyllo v. United States, 533 U.S. 27, 31 (2001).  Among those exceptions are a "protective sweep," pursuant to Maryland v. Buie, 494 U.S. 325, 327 (1990), and exigent circumstances, Brigham City v. Stuart, 547 U.S. 398, 403 (2006).[3]

---

[2]Florida courts are bound by United States Supreme Court precedent construing the Fourth Amendment to the United States Constitution.  Art. I, § 12, Fla. Const.; Bernie v. State, 524 So. 2d 988, 991 (Fla. 1988).

[3]Although the parties and the trial court utilized the term "protective sweep," it is the latter exigent-circumstances exception that applies to the facts of this case.  The exception permitting a warrantless "protective sweep" applies in situations where such a search is performed incident to a lawful arrest in order to protect the safety of the officers or others.  United States v. Delancy, 502 F.3d 1297, 1306 (11th Cir. 2007).

The exigent-circumstances exception encompasses an "emergency situation which requires the police to assist or render aid." Seibert v. State, 923 So. 2d 460, 468 (Fla. 2006) (citing Mincey v. Arizona, 437 U.S. 385, 392 (1978)). Entering a home to investigate a suspected burglary or to check on the safety of its residents, for example, can constitute exigent circumstances sufficient to permit a warrantless search. See Davis v. State, 834 So. 2d 322, 327 (Fla. 5th DCA 2003) (first citing State v. Craycraft, 704 So. 2d 593 (Fla. 4th DCA 1997); and then citing State v. Haines, 543 So. 2d 1278 (Fla. 5th DCA 1989)).

Law enforcement had an objectively reasonable basis to support their sweep of Mr. Aguilar's house in light of the exigent circumstances they encountered upon their arrival—the 9-1-1 call, the on-scene reports of a shooting, the broken window, the scent of gunpowder, and the unknown status of potential occupants—making their initial, warrantless entry lawful. See Seibert, 923 So. 2d at 468; State v. Fultz, 189 So. 3d 155, 158 (Fla. 2d DCA 2016); Vanslyke v. State, 936 So. 2d 1218, 1221–22 (Fla. 2d DCA 2006) (citing Brigham City, 547 U.S. at 403). However, such an entry must be limited in its scope. Rolling v. State, 695 So. 2d 278, 293 (Fla. 1997). And once the exigency ceases to exist, so does the limited exception to the warrant requirement. See Anderson v. State, 665 So. 2d 281, 283 (Fla. 5th DCA 1995).

It took a few minutes for Lieutenant Andrews and the deputies to complete the lawful sweep of Mr. Aguilar's duplex to locate potential shooters or victims, to clear the residence, and to secure the scene. At this point, the exigency had ended. As such, the police needed to obtain a warrant or Mr. Aguilar's consent in order to lawfully reenter and search the duplex.

Detective Johnson subsequently entered Mr. Aguilar's residence without a warrant and before Mr. Aguilar signed the consent form. He admitted that his entry was not part of the security sweep. And while he indicated that one motivation was to get any remaining individuals out of the house in order to secure the crime scene and start the investigation, all other testimony indicates that no one remained in the house upon his arrival and that the scene had already been secured.

The trial court based its conclusion that Detective Johnson's entry was not illegal, in part, on the fact that he did not find anything while he was in the house. This does not follow, because the "Fourth Amendment's protection of the home has never been tied to measurement of the quality or quantity of information obtained." Kyllo, 533 U.S. at 37. "[T]here is certainly no exception to the warrant requirement for the officer who barely cracks open the front door and sees nothing but the nonintimate rug on the vestibule floor. In the home . . . all details are intimate details, because the entire area is held safe from prying government eyes." Id. ("[A]ny physical invasion of the structure of the home, 'by even a fraction of an inch,' [is] too much[.]" (quoting Silverman v. United States, 365 U.S. 505, 512 (1961))).

The trial court's factual findings—that Detective Johnson went in to "look around" and decide what "we have" and whether it is "an actual crime scene"—and Detective Johnson's own testimony indicate that his entry violated the Fourth Amendment. Detective Johnson's insistence on the necessity of "fact-finding" upon his initial entry to the house indicates an investigative purpose not related to the exigent circumstances that justified the sweep conducted by the officers who had arrived earlier. Although his primary purpose might have been to clear the residence, his "look at

everything to see what kind of crime that occurred" and to determine what "the evidence" is and what "we have on scene" is still a search. Venturing inside a person's home without a warrant or a valid exception violates the Fourth Amendment and therefore constitutes illegal police conduct.

The State generally has the burden of proving the voluntariness of the consent by a preponderance of the evidence; however, where, as here, there has been illegal conduct on the part of the police, that burden is heavier, requiring clear and convincing evidence that the consent was not a product of that illegal conduct. See Reynolds v. State, 592 So. 2d 1082, 1086 (Fla. 1992); see also Connor, 803 So. 2d at 609 ("[W]hen consent is obtained after illegal police activity such as an illegal search or arrest, the unlawful police action presumptively taints and renders involuntary any consent to search."); Neeley v. State, 112 So. 3d 764, 766 (Fla. 2d DCA 2013). Because the consent is presumptively involuntary, the "consent will be held voluntary only if there is clear and convincing proof of an unequivocal break in the chain of illegality sufficient to dissipate the taint of prior official illegal action." Norman v. State, 379 So. 2d 643, 647 (Fla. 1980).

Application of this exception to the exclusionary rule turns on three factors: "(1) the time elapsed between the illegality and the acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct." State v. Frierson, 926 So. 2d 1139, 1143 (Fla. 2006) (quoting United States v. Green, 111 F.3d 515, 521 (7th Cir. 1997)). Evidence of advice to a defendant of his right to refuse consent may dissipate the taint of prior illegal police action. State v. Boyd, 615 So. 2d 786, 790 (Fla. 2d DCA 1993); State v. Paul, 638 So. 2d 537, 539

- 11 -

(Fla. 5th DCA 1994) ("The taint may be dissipated when the defendant is advised of his constitutional right to refuse consent to search and nonetheless voluntarily does so."). But see Reed v. State, 577 So. 2d 1362, 1363 (Fla. 2d DCA 1991) (finding the fact that the officer informed the defendant that he did not have to consent was insufficient, without more, to purge the taint of the illegal stop).

Here, the illegal entry by Detective Johnson occurred at some point after his arrival on scene around 2:28 a.m. It is undisputed that the consent form was signed at 2:47 a.m., less than twenty minutes later, which weighs in favor of exclusion. See Alvarez v. State, 515 So. 2d 286, 288 (Fla. 4th DCA 1987) ("[T]he closer the connection between a consent and any improper conduct by the police, the less likely a consent will be found to be freely and voluntarily given, as opposed to being the natural consequence of the police misconduct."). However, in the interim, Mr. Aguilar agreed to walk Detective Liddell through the duplex in an effort to explain the circumstances surrounding the burglary. Additionally, Mr. Aguilar's actions demonstrated that he was aware of his right to refuse to sign the consent form. First, his initial refusal to do so suggests that he knew he had that option. Second, by giving partial consent—limiting the areas of the home in which he allowed the officers to search—he acknowledged his right to refuse consent to areas he did not want to be searched.

Lastly, the prior illegal law enforcement activity itself was not flagrant. Although Detective Johnson's testimony indicates that he conducted a search, it was cursory. Detective Johnson's testimony suggests that the primary purpose of his entry was not to search the residence but to clear the home in order to facilitate a future investigation of the premises, which did not begin until after consent had been obtained.

His testimony suggests that while he noticed his surroundings while inside, including the smell of gun powder (which he had already smelled in the carport before entering), spent shell casings, and a broken window, he did not open or move anything. Moreover, although Detective Johnson ultimately recovered the firearm, the discovery was not made during his initial, illicit entry, and he was not the one who obtained Mr. Aguilar's consent. And there were no indications that the police relied upon the fruits of Detective Johnson's illegal search in order to obtain that consent. Accordingly, the State met its burden of presenting clear and convincing proof of an unequivocal break in the chain of illegality sufficient to dissipate the taint of prior official illegal action. See Golphin v. State, 945 So. 2d 1174, 1191 (Fla. 2006).[4]

Having determined that the consent was not the product of Detective Johnson's unlawful entry, thereby overcoming the rebuttable presumption that it was involuntary, Mr. Aguilar's alternative argument, that his consent was involuntary under the totality of the circumstances, must be addressed. See Luna-Martinez v. State, 984 So. 2d 592, 602–03 (Fla. 2d DCA 2008) (Villanti, J., dissenting) ("[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973))). This requires consideration "of subtly coercive police questions, as well as the possibly

---

[4]The State contends that suppression was not warranted, even if the police located the firearm without Mr. Aguilar's consent or outside of the scope of his consent, based on the inevitable-discovery exception to the exclusionary rule. However, this argument is foreclosed by Rodriguez v. State, 187 So. 3d 841, 849–50 (Fla. 2015), which held that the exception does not apply where "the prosecution has made no showing that a search warrant was being actively pursued prior to the occurrence of the illegal conduct."

vulnerable subjective state of the person who consents." Bustamonte, 412 U.S. at 229.

Other factors include whether that person is being arrested or detained, his or her age, education, or intelligence, whether he or she is in a vulnerable physical or mental state, and whether law enforcement made a show of force or engaged in threatening conduct or prolonged detention. I.R.C. v. State, 968 So. 2d 583, 586–87 (Fla. 2d DCA 2007). In addition, the location of the search, the time of day, the number of officers involved, and the type of consent (written or oral) are relevant in making this determination, as well as any prior criminal history of the accused, the length of time police interrogated him before he consented, and whether he was in custody. State v. Ojeda, 147 So. 3d 53, 57 (Fla. 3d DCA 2014).

Mr. Aguilar was arguably in a vulnerable mental state when he signed the consent form at 2:47 a.m. Indeed, when the first seven officers arrived at 2:11 a.m., they encountered Mr. Aguilar in a state of panic, pacing back and forth in the small carport near the front door of the duplex. Mr. Aguilar saw multiple police officers—as many as ten—going in and out of his duplex. Mr. Aguilar was not permitted to reenter the duplex to retrieve supplies for his baby without as many as four uniformed deputies accompanying him. And he initially refused to sign the consent form presented to him by Deputy Schwartz, reluctantly agreeing to sign the form only after Deputy Schwartz's subsequent request.

On the other hand, only a single deputy approached Mr. Aguilar to obtain the consent; he read the form to Mr. Aguilar and advised Mr. Aguilar that he was not being arrested or detained and that he could refuse to consent to the search. The fact that Mr. Aguilar appeared nervous can be attributed to his having just endured a near-

death experience—someone invading his home and shooting at him while his girlfriend and two young children were sleeping—not any heavy-handedness or show of force of the officers, who were reasonably present to investigate a crime of which the defendant was the alleged victim. Cf. Ojeda, 147 So. 3d at 58 n.4 ("To some extent, any encounter with an officer of the law may lead to some apprehension," but "this fact alone cannot support a seizure under the Fourth Amendment." (first citing Oregon v. Mathiason, 429 U.S. 492, 495 (1977); and then citing Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968))). Additionally, Mr. Aguilar was a twenty-eight-year-old with prior felony convictions for driving with a suspended license and marijuana possession, creating an assumption that he knew his rights. See Ojeda, 147 So. 3d at 57–58.

While Mr. Aguilar's testimony regarding his consent is contradictory, much of it strongly supports the conclusion that his consent was free and voluntary. See I.R.C., 968 So. 2d at 586 (finding the State had established the voluntariness of defendant's consent even though he had testified "he had no choice but to consent"); State v. Kuntzwiler, 585 So. 2d 1096, 1096 (Fla. 4th DCA 1991) (affirming determination that consent was voluntary despite defendant's testimony that "she believed she had no choice but to allow the search"). When questioned by defense counsel—"Did you think you had a choice in signing that or did you think that whether you signed that form or not was going to matter whether or not they searched your house?"—Mr. Aguilar tepidly answered, "Not really." However, when asked a direct question by the State—"So you knew that you had the right to refuse to sign the document?"—he tacitly but clearly answered in the affirmative: "Which I did the first time."

- 15 -

In addition to expressly acknowledging that he had the right to refuse, Mr. Aguilar exhibited an understanding that he could withhold his consent to some areas of the house. Further, his reasons for initially refusing—e.g., "they had already taken pictures of the crime scene . . . and I didn't see there was no reason why if they had already done their job"—do not indicate that he was resisting under the buckling pressure of law enforcement but rather disagreeing as to whether the burglary needed to be investigated any further at all.

Additionally, there was no testimony to suggest that Deputy Schwartz or any of the other officers or detectives used intimidation, threats, or any other overtly coercive tactics. Rather, by the defendant's own admission, the law enforcement officer who obtained the consent posed Mr. Aguilar with a choice between signing the consent form and having no investigation of the alleged burglary of which Mr. Aguilar was a victim: "He . . . tells me, if you want me to start the burglary investigation, I need you to sign this." The choice Deputy Schwartz posed to Mr. Aguilar was not between signing the form and being detained by law enforcement. Rather, quite intuitively, they could not investigate the crime that had been allegedly committed against him unless he consented to a search of the scene of the crime—his home.

Mr. Aguilar argues that the time of the officers' arrival supports that his consent was not voluntarily given. However, this is not a scenario in which law enforcement officers arrived at a strategic time of their own choosing, from which a defendant could possibly draw reasonable inferences about whether he was free to refuse consent. Rather, the only logical inference to be drawn by Mr. Aguilar was that

the officers had arrived at the time they did, not by design, but in response to the emergent situation that had recently developed at his property.

Mr. Aguilar argues that the large number of officers at his home undermines the voluntariness of his consent. However, the convergence of ten officers seems an intuitive response to calls about what sounded like a gunfight being fought out in a residential neighborhood where someone had recently been wounded during a previous shooting. As the court found in Ojeda (where five officers entered the house and two remained on the sidewalk), nothing here suggests that the mere number of officers "overpowered [Mr. Aguilar's] decision-making faculties." Ojeda, 147 So. 3d at 59. There, it was "entirely reasonable to order a complement of seven law enforcement officers to investigate" a tip that marijuana was being grown at the defendant's residence because the "inherent danger involved in a narcotics investigation compels the use of caution." Id. Much more so an investigation of a flurry of gunfire.

Mr. Aguilar contends that his cooperation and consent was not voluntary but rather a submission to a show of coercive police authority—including denial of access of his home, which had been cordoned off as a crime scene—that amounted to a seizure. To the contrary, as the victim of a crime, the police questioned Mr. Aguilar about—and he willingly explained—the circumstances of the alleged burglary and shooting. In Ojeda, the court noted that the defendant never elected to terminate the encounter; rather, he communicated with the authorities in a cooperative spirit from the moment that he opened the front door. Id. at 58. While Mr. Aguilar's cooperation was tempered by some equivocation, he was amenable to walking an officer through the residence to give them his blow-by-blow recounting of the home invasion. Further, his

explanation of the limitation on his consent suggests that he did want the officers to investigate the burglary. And no evidence indicates that he was not free to leave; the simple fact that he was barred from his own home and may not have had anywhere he felt comfortable going (an unfortunate consequence of the fact that his home was a crime scene) does not rise to the level of detention. The officers were at his home under the very reasonable auspices of the investigation of an alleged crime of which the defendant was the alleged victim. Thus, any inconvenience to him, such as having to be escorted back into the home to retrieve belongings for his children, was a natural result of the violent event that had just taken place, not something imposed upon him by officers of the law as a show of force.

In light of the totality of the circumstances, the trial court did not err in finding that Mr. Aguilar's consent to the search was voluntarily given. However, it did err when it found that the officers' good faith justified their search in excess of the scope of that consent.

The trial court explained that even though Mr. Aguilar had limited the search areas, the officers could have, effectively, misunderstood which rooms he had given them consent to search:

> [T]here seems to be a difference of opinion about labels, but Mr. Aguilar says what he told them is they could only search the living area and what he referred to as the first bedroom, I think, or the master bedroom, and Detective Liddell indicates that that's where they found the firearm. Now there is a difference of opinion, I know, between what Mr. Aguilar thinks he was telling them they couldn't search and . . . where they found the gun about the label, whether it's the master bedroom or the front room or whatever. But the point is, if that was an oral communication, clearly the law enforcement people knew they had some authority and perhaps there was a difference of opinion about what his

- 18 -

reference to whatever room it was was the limitation.  So even if they violated that, I think that would have to rise to the level of good faith.

The testimony at the hearing was indeed confusing, such that it is difficult for even a careful student of the cold transcript to determine whether the firearm was discovered in a room to which Mr. Aguilar denied consent to search.  However, the State bears the burden of establishing the scope of consent and whether law enforcement remained within it.  State v. Petion, 992 So. 2d 889, 896 (Fla. 2d DCA 2008) (citing United States v. Freeman, 482 F.3d 829, 832 (5th Cir. 2007)).

Nonetheless, the trial court denied the motion on the basis that confusion regarding the scope of Mr. Aguilar's consent gave rise to a good faith belief in the officers that they were not exceeding it.  But the question is not whether the officers had a good faith belief that they were searching within the scope of the homeowner's consent.  Rather, courts must use the following objective reasonableness standard to measure the scope of consent:  "[W]hat would the typical reasonable person have understood by the exchange between the officer and the suspect?"  Davis v. State, 594 So. 2d 264, 266 (Fla. 1992) (quoting Florida v. Jimeno, 500 U.S. 248 (1991)); see also State v. Wells, 539 So. 2d 464, 467 (Fla. 1989) ("When the police are relying upon consent to conduct a warrantless search, they have no more authority than that reasonably conferred by the terms of the consent."), aff'd sub nom. Florida v. Wells, 495 U.S. 1 (1990)).

The trial court's factual finding that Mr. Aguilar had limited his consent to a search of his home cannot be disturbed, as it was based on competent, substantial evidence.  See Crist v. State, 98 So. 3d 81, 83 (Fla. 2d DCA 2012).  The trial court

specifically credited Mr. Aguilar's testimony, indicating that he was taking it "at its face value, even though the officers don't recall any of that conversation, he tried to limit it."

Mr. Aguilar consistently testified that he only gave consent to search the "front bedroom and living room"—the rooms associated with the burglary, where the officers observed bullet holes, casings, and broken windows. And Mr. Aguilar gave his consent only after Deputy Schwartz indicated that Mr. Aguilar needed to sign the consent form in order for the police to begin the burglary investigation. In his probable cause affidavit, Detective Johnson purported to have found the weapon "where the defendant sleeps," and he testified that, "on the night of the shooting," the family was "sleeping in the back bedroom."

Those facts do not support that it was objectively reasonable to have understood that the room in which the firearm was located was within the scope of Mr. Aguilar's consent. On the other hand, other testimony does. For example, Detective Liddell testified that the weapon was found in the master bedroom, which he indicated was the first bedroom on the left, not the bedroom in the back, suggesting that the weapon might have been discovered in the very room Mr. Aguilar consented to be searched.

However, we need not resolve that factual imbroglio to determine that the trial court's conclusion was erroneous. That is because the State—in the face of credited testimony that Mr. Aguilar limited the scope of his consent—adduced no evidence that the law enforcement officers understood that the consent was limited at all, much less any evidence that their search was actually limited. Deputy Schwartz, who testified that he was the only person near Mr. Aguilar while he went over the form,

- 20 -

did not provide any explanation as to why the words "just for" appeared on the form; he denied that Mr. Aguilar narrowed the scope of his consent in any way.

The trial court concluded that, "if" the officers exceeded the scope of the consent, they did so in good faith in light of the "difference of opinion" regarding which rooms were included in that scope. This conclusion elides the State's burden to establish what a typical reasonable person would have understood Mr. Aguilar's consent to have included and to prove the officers did not exceed it. More importantly, it cannot be squared with the facts adduced at the hearing—that the officers neither acknowledged nor observed any limitations on the consent whatsoever. Objective reasonableness cannot be attributed to a law enforcement officer's belief that he was searching within the limitations of a scope that he does not even acknowledge existed.

The State failed to meet its burden to establish that the search did not exceed the scope of Mr. Aguilar's consent. As such, the trial court erred by denying his motion to suppress the firearm. Accordingly, we reverse and, because the motion was dispositive, remand with instructions that Mr. Aguilar be discharged.

Reversed and remanded for discharge.

VILLANTI and MORRIS, JJ., Concur.